UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TALOAN SWIFT,

                             Plaintiff,

              v.

TWC ADMINISTRATION LLC (TWCA),

                             Defendant.
_____

|                | |
|----------------|---|
| REPORT | |
| and | |
| RECOMMENDATION | |
| | |
| 16-CV-00407V(F) | |

APPEARANCES:        THE REDDY LAW FIRM LLC
                             Attorneys for Plaintiff
                             PRATHIMA C. REDDY, of Counsel
                             455 Linwood Avenue
                             Buffalo, New York  14209

                             M. ROGAN MORTON, ESQ.
                             Attorney for Defendant
                             21 Rugby Road
                             Buffalo, New York  14216

                             KABAT CHAPMAN & OZMER LLP
                             Attorneys for Defendant
                             ABIGAIL STECKER ROMERO and
                             PAUL G. SHERMAN, of Counsel
                             171 17th Street NW
                             Suite 1550
                             Atlanta, Georgia  30363

## **JURISDICTION**

On April 5, 2018, Honorable Lawrence J. Vilardo referred this case to the

undersigned for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendant's motion for summary judgment filed March 29, 2018 (Dkt. 43).

## BACKGROUND

On May 24, 2016, Plaintiff Taloan Swift ("Plaintiff"), commenced this action alleging race and gender-based employment discrimination and retaliation against his former employer Time Warner Cable Administration, LLC ("Defendant"), in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and New York State Human Rights Law.  Defendant filed an answer on July 11, 2016 (Dkt. 4).

On March 29, 2018, Defendant filed the instant motion for summary judgment (Dkt. 43) ("Defendant's Motion"), attaching the Memorandum of Law in Support of Defendant's Motion for Summary Judgment (Dkt. 43-1) ("Defendant's Memorandum"), Local Rule 56 Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (Dkt. 43-2) ("Defendant's Statement of Facts"), Defendant's Appendix to Local Rule 56 Statement of Material Facts (Dkt. 43-3), the Affidavit of Abigail Stecker Romero, Esq. (Dkt. 43-4) ("Romero Affidavit"), and the Affidavit of Amy Lauricella (Dkt. 43-6) ("Lauricella Affidavit"), with exhibits 1 through 8 (Dkts. 43-7 through 43-14) ("Defendant's Exh(s). __").  An Order filed April 9, 2018 (Dkt. 45), set May 9, 2018 as the deadline for Plaintiff to file a response opposing summary judgment, with Defendant to file any reply by May 23, 2018.  Plaintiff, however, never filed any response, a point on which Defendant relies in Defendant's Reply in Support of Motion for Summary Judgment (Dkt. 47), filed May 18, 2018.  Oral argument was deemed unnecessary.

Based on the following, Defendant's Motion should be GRANTED.

# FACTS[1]

On November 13, 2000, Plaintiff Taloan Swift ("Plaintiff" or "Swift"), commenced

employment with Defendant TWC Administration, LLC ("Defendant" or "TWC"),[2] as a

company representative, and was promoted in October 2013 to Customer Advocate in

the Corporate Office of the President ("OTP" or "COTP") ("OTP Advocate"), a position in

which Plaintiff assisted with resolving "high level escalati[ng]"[3] customer complaints,

Swift Dep.[4] at 38, requiring OTP Advocates "have strong customer service skills and the

ability to maintain a professional demeanor when dealing with extremely emotional

and/or angry customers."  OTP Advocate Job Description.[5]  At all times relevant to this

action, Amy Lauricella ("Lauricella"), was Senior Human Resources Generalist,

personally familiar with TWC's employment policies, practices, and procedures.  TWC is

an equal-opportunity employer and maintains policies prohibiting discrimination with

regard to hiring, promotions, general conduct in the workplace, discipline, and

termination to which all employees are expected to strictly adhere.  TWC Employment

Policy.[6]  TWC also maintains an "Open Door Process" through which employees are

---

[1] Taken from the pleadings and motion papers filed in this action, including the Complaint which is Plaintiff's only filed document containing factual allegations, and Defendant's Statement of Facts which, in light of Plaintiff's failure to respond to summary judgment, including failing to respond to each of Defendant's separately enumerated purportedly undisputed facts as required by Local Rule of Civil Procedure – WDNY 56(a)(2), are taken as true insofar as such facts stated therein are supported by the record.  *See Marino v. Schult*, 764 Fed.Appx. 73, 74 (Apr. 4, 2019) ("If a non-moving party fails to comply with local rules governing summary judgment, a district court may rely on a moving party's statement of undisputed facts as long as those facts are supported by the record.") (citing *N.Y.S. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005)).
[2] Plaintiff alleges when he commenced working in November 2000, he worked for Defendant's predecessor company, Adelphia Communications, Complaint ¶ 11, which Defendant denies, Answer ¶ 11, but it is undisputed that at all times relevant to this action, Plaintiff was an employee of TWC.
[3] Unless otherwise indicated, bracketed material has been added.
[4] References to "Swift Dep." are to the pages of the transcript of Plaintiff's March 13, 2017 deposition, portions of which are filed as Dkt. 43-5.
[5] Dkt. 43-9.
[6] Dkt. 43-7.

encouraged to report suspected discrimination or harassment to TWC's Human Resources Department.  Open Door Policy.[7]

Throughout much of 2014, OTP operated without a designated supervisor or manager with a manager from another department supervising the OTP Advocates on an interim basis, but the circumstances resulted in a "relaxed environment" with employees engaging in inappropriate conduct.  Swift Dep., Exh. 17 Dkt. 43-15 at 12; Dkt. 43-12 at 14; Bates TWC000330.[8]  On August 6, 2014, Plaintiff was issued a written warning for violating TWC's Standards of Business Conduct based on Plaintiff's inappropriate handling of a customer complaint on July 9 and 10, 2014.  Lauricella Affidavit ¶ 9; Dkt. 43-11at 2-3 (Bates TWC000053-54).  Plaintiff disputed the disciplinary action, asserting the customer had used racially abusive language toward him.

In late 2014, Lonney Krentz ("Krentz"), became manager of the OTP Advocates, and Paula Takach ("Takach") became supervisor of the OTP Advocates, serving under Krentz.  During a January 21, 2015 meeting ("OTP department meeting"), Krentz solicited opinions from the OTP Advocates regarding the status of OTP and ideas for improving the workplace.  Dkt. 43-14 at Bates TWC0266.  During the meeting, Plaintiff raised concerns that, based on Plaintiff's own research using census data and zip codes, the majority of customers whose services were terminated by TWC were minorities.  Plaintiff's Dep. at 160-61.

By e-mail to Krentz and one Seth Gertsman dated January 22, 2015, Plaintiff, in accordance with the Krentz's request at the prior day's meeting, complained that on multiple occasions he endured abuse and harassment by challenging customers who

---

[7] Dkt. 43-8.
[8] Where necessary, the Bates stamped page number is included for clarification.

directed personal insults and racial epithets toward Plaintiff.  Dkt. 43-14 at 4 (Bates TWC000266).  That same day, Krentz responded by e-mail that he appreciated Plaintiff's concerns which would be used "in moving the team into the direction we feel is necessary for the overall success of the team," *id.* at 3 (Bates TWC000265), and Plaintiff responded by further e-mail thanking Krentz for his attention.  *Id.*  By e-mail to all OTP Advocates dated January 23, 2015, Krentz advised that no OTP Advocate was required "to deal with personal threats or racial slurs," and if an OTP Advocate encountered a customer providing either, the OTP Advocate was to advise the customer that if the behavior continued, the customer service call would be ended, adding "[t]hreats and/or racial slurs are not to be taken lightly and will be addressed." Dkt. 43-14 at 6-7 (Bates TWC000263-64).  Plaintiff responded with another email consisting solely of a smiley face emoji, *i.e.*, 😊.  *Id.* at 6 (Bates TWC000263).

Following the OTP department meeting, several other TCW employees, including OTP employees Christine Lauer ("Lauer") and Seth Silsby ("Silsby"), expressed to Krentz concerns that Plaintiff and another employee, one "Bowman," created a "negative team environment" by engaging in inappropriate behavior and making racial remarks.  Dkt. 43-5 at 76; Dkt. 43-12 at 2 (Bates TWC000318).  Because of the complaints' "disturbing nature," on January 26, 2015, Krentz referred the matter to TWC's Human Resources Department where Lauricella assigned Employee Relations Manager Sharema Valentine ("Valentine") to investigate the matter ("the ER Investigation").  Lauricella Affidavit ¶ 10; Dkt. 43-5 at 76-77; Dkt. 43-12 at 2-3 (Bates TWC 000318-19).

In her report on the ER Investigation ("Investigation Report") issued March 11, 2015, Valentine details numerous reported incidents of Plaintiff's malfeasance reported by Lauer including, for example, that Plaintiff

- asked Lauer who had inquired as to Silsby's whereabouts, "Don't you white people stick together?";

- asked Lauer if she were a "cutter," *i.e.*, someone who engages in self-harm;

- asked another coworker if she had "nude photos" stored on her cell phone;

- referred to a customer as a "[p]ink thong wearing faggot";

- expressed his belief that certain customers he was assisting, based on their age and location, were racist;

- told Lauer she needed to thank Martin Luther King, Jr., for having a day off on his birthday;

- made such sexist statements as "women should stay in the kitchen";

- filled the OTP call center floor with negativity;

- regularly used his personal cell phone in violation of TWC's policy against use of a personal cell phone absent an emergency; and

- stated "people who are left-handed are weird," that Plaintiff was conducting independent research on left-handedness, and appeared to have a "hatred for people that are left-handed."

Dkt. 43-5 at 77-78; Dkt. 43-12 at 3-4 (Bates TWC 000319-20).

When interviewed by Valentine, Lauer also reported Plaintiff and Bowman stopped speaking with Silsby and Plaintiff was concerned she, Lauer, would likewise be shunned in retaliation if Plaintiff and Bowman learned Lauer raised her concerns about them with management. *Id.*  According to Lauer, Plaintiff tried to make Lauer feel guilty for being Caucasian, and that Plaintiff had a reputation for "not having a filter," and for exerting much influence over many co-workers, including Bowman. *Id.*

In continuing the ER Investigation, Valentine also interviewed Silsby who raised similar concerns, including, *inter alia*, that Plaintiff

- frequently made derogatory comments and jokes about Caucasians, including, for example:

    - making references to a Ku Klux Klan documentary which Plaintiff recommended Silsby watch;

    - accusing white customers who called of feeling "entitled"; and

    - stating, with regard to the Martin Luther King, Jr. holiday that African-Americans had the day off, "but white people have to work";

- spoke negatively about women, including commenting that "women belong in the kitchen," and "women are stupid";

- "attempted to demotivate his colleagues from doing work and focusing on customers," and his conduct was beginning to influence some of his colleagues to behave likewise.

Dkt. 43-5 at 79; Dkt. 43-12 at 5 (Bates TWC 000321).

Silsby further reported Plaintiff's misconduct increased in the absence of a dedicated manager for the OTP Advocate team, and expressed concern for retaliation if Plaintiff learned of Silsby's complaints. Dkt. 43-5 at 80; Dkt. 43-12 at 6 (Bates TWC000322).

Valentine interviewed eight additional TWC employees, a majority of whom substantiated the concerns raised by Lauer and Silsby, with some also reporting they found such conduct by Plaintiff to be offensive. Dkt. 43-5 at 80-85; Dkt. 43-12 at 6-11 (Bates TWC000322-27). When Valentine interviewed Plaintiff in connection with the ER Investigation, Plaintiff admitted making many of the offensive statements reported by Lauer and Silsby, Dkt. 43-5 at 82-85, ¶¶ 5-8, 10-11, 15-16; Dkt. 43-12 at 8-11, ¶¶ 5-8, 10-11, 15-16; Plaintiff's Dep. at 176-80, 190, advising he did not interact with "the Caucasians" because he "did not identify with them." Dkt. 43-5 at 86; Dkt. 43-12 at 12

(Bates TWC000328). Plaintiff regularly "blocked" co-workers, including his supervisor Takach, from communicating with him through TWC's instant messaging system to demonstrate his dislike of them. Dkt. 43-5 at 88; Dkt. 43-12 at 14 (Bates TWC00030). Plaintiff's inappropriate conduct increased when Plaintiff, while working in the OTP, sat closer to Bowman who was also accused of misconduct. Dkt. 43-5 at 87; Dkt. 43-12 at 13 (Bates TWC000329). Valentine's ER Investigation further revealed that Lauer and Silsby raised their concerns regarding Plaintiff with management because "they were simply tired of being subjected" to Plaintiff's behavior, and were no longer comfortable coming to work, Dkt. 43-5 at 86; Dkt. 43-12 at 12 (Bates TWC000328), and numerous co-workers expressed concern that Plaintiff would retaliate against them because of the ER Investigation. Dkt. 43-5 at 89; Dkt. 43-12 at 15 (Bates TWC000331). In addition to complaints by co-workers, Valentine also investigated complaints from Plaintiff's OTP supervisor, Takach, who shared with Valentine an e-mail Plaintiff sent on February 15, 2015, accusing Takach of being "abrasive, alienating, and outright obnoxious." Dkt. 43-5 at 68; Dkt. 43-14 (Bates TWC000247).

While the ER Investigation was on-going, Krentz received additional complaints about Plaintiff. Specifically, in an e-mail dated January 28, 2015, Takach advised Krentz that on January 22, 2015, Plaintiff, in attempting to "re-establish" a working relationship with Takach who had recently become Plaintiff's supervisor, engaged in an "intimidating" conversation essentially painting TWC's upper management as "scapegoaters" who commonly shifted blame for their own poor decisions to others, and that the "conversation was so inappropriate and unprofessional," as to cause Takach to reconsider her supervisory position, but she ultimately decided to go forward after

remembering Plaintiff had "manipulated information and circumstances" when working with Takach in the past.  Dkt. 43-5 at 62-63; Dkt. 43-14 at 13-14 (Bates TWC000239-40).  In yet another e-mail to Krentz dated February 3, 2015, Takach recounted an incident on February 2, 2015, in which Takach assumed responsibility for a particular customer complaint and reached out to TWC's Technology Manager, via e-mail, for help, copying OTP employees on the e-mail's distribution.  Dkt. 43-5 at 64-65; Dkt. 43-14 at 25-26 (Bates TWC000243-44).  When three hours passed yet Takach received no response to her e-mail, Takach "sent up another flare [e-mail] in hopes of getting some kind of traction for this customer."  *Id.*  After sending the second e-mail, Plaintiff approached Takach and, in a condescending and mocking tone, advised Plaintiff had "no leverage to get anything done," which Takach interpreted as implying Plaintiff intended to make Takach feel powerless in her supervisory role so as to discourage Takach from implementing any changes or improvements within the department, thereby allowing Plaintiff to "just continue to slide by under the radar."  *Id.*  Takach continued that over the "last few years" she had observed Plaintiff "in a perpetual state of negativity" that was not "a passing slump" and that "[w]hat good he brings to the table is far outweighed by his constant criticism of TWC and its employees," expressing concern that Plaintiff's "negative behavior and senior status on the COTP team could be perceived as intimidating and eat away at the good intentions and hard work being attempted by the newer agents in the group."  *Id.*

On March 3, 2015, one particular co-worker, Vonda Rutherford ("Rutherford"), who "appeared noticeably scared," separately reported to Krentz that Plaintiff had a history of retaliation, yet had a "following" within the building, that Plaintiff regularly

spoke about guns and told her, "If I call at 2 [sic] in the morning, just make sure you have plastic for the body."  Dkt. 43-5 at 75 (Bates TWC000262).  Rutherford reported several other derogatory comments Plaintiff made regarding race and women.  *Id.*

Meanwhile, on February 9, 2015, Plaintiff received a verbal warning about using his personal cell phone on TWC's call center floor.  Dkt. 43-5 at 99; Dkt. 43-1 at 2 (Bates TWC000167).

On March 5, 2015, before the ER Investigation's conclusion, Plaintiff was placed on administrative leave.  On March 11, 2015, Valentine transmitted the Investigation Report to Lauricella who shared it with Plaintiff's managers.  On March 13, 2015, TWC terminated Plaintiff's employment "[a]s a result of various policy violations. . . ," including failing to adhere to TWC's Standards on Business Conduct Policy, engaging in workplace violence by using language and conversing with others in a manner that caused others to fear for the general safety of the workplace, their own personal safety, or the safety of their family, misuse of TWC's cell phone policy limiting use of an employee's cell phone for non-work purposes to designated break times, and engaging in conduct disrespectful of co-workers.  Termination Notice (Dkt. 43-13) at 2-3 (Bates TWC000167-68).  Plaintiff's did not sign the Termination Notice, which indicates Plaintiff's acknowledged the Termination Notice "via phone," and also stated his opposition to the termination on several grounds including he was never "coached" regarding the alleged cell phone policy violation and that the use of personal cell phones is a regular occurrence on the customer call center floor, implying others were not similarly disciplined for using a cell phone.  *Id.* at 4.  Plaintiff also disputed the allegations against him, asserted Krentz encouraged other co-workers to lie so as to

manipulate TWC's employee discipline process, and maintained other employees were not disciplined for comments that violated TWC's policy.  *Id.*  The record, however, does not indicate whether any internal appeal procedure was available nor, if so, whether Plaintiff availed himself of such appeal procedure.

On August 6, 2015, Plaintiff filed a Charge of Discrimination with Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and retaliation based on his race and sex.  Dkt. 43-5 at 105-106 (Bates TWC000425-26).  In particular, Plaintiff claimed the ER Investigation was commenced in response to Plaintiff's complaints made to TWC management in August 2014 and on January 21, 2015 regarding customers who used racially derogatory language and Plaintiff's determination that the customers who had their services terminated by TWC were mostly minorities.  *Id.*  Defendant asserts, Defendant's Statement of Facts ¶ 53, and Plaintiff does not dispute, that the EEOC was "unable to conclude" that TWC violated any law, advising Plaintiff "[t]he statutes that we enforce do not protect you when you are being accused of being the harasser which appears to be the case here."[9]  This action followed.

## **DISCUSSION**

## 1.    **Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving

---

[9] The court notes no copy of the EEOC's determination is in the record, nor has Plaintiff filed a copy of a Notice of Right to Sue which the EEOC generally issues upon concluding its investigation.  Defendant, however, does not assert that Plaintiff failed to exhaust administrative remedies prior to commencing this action.

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

   "[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).   "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

## 2.    Employment Discrimination

Plaintiff asserts a race-based employment discrimination claim under 42 U.S.C. § 1981 ("§ 1981"), Complaint ¶¶ 24-29 ("First Claim"); and race and gender-based discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), Complaint ¶¶ 37-39 ("Third Claim"), and New York Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), Complaint ¶¶ 40-42 ("Fourth Claim").[10]  Employment discrimination claims, whether brought under § 1981, Title VII, or NYSHRL, are analyzed "under the same burden shifting framework as set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *McGill v. University of Rochester*, 600 Fed.Appx. 789, 790 (2d Cir. Jan. 30, 2015) (citing cases).  Under the so-called "*McDonnell Douglas* burden shifting test," to establish a claim for discriminatory discharge, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse

---

[10] Plaintiff's Second, Fifth, and Sixth claims asserting retaliation under, respectively, § 1981, Title VII, and NYSHRL, are discussed *infra*, at 19-23.

employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination." *Ruiz v. County of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010). Upon the plaintiff meeting this initial burden, "the burden shifts to the defendant employer to articulate 'some legitimate, nondiscriminatory reason' for its action." *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). Should the defendant meet its burden, "the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for race discrimination. . . ." *Kirkland v. Cablevision System*, 760 F.3d 223, 225 (2d Cir. 2014) ("the employee's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination." (internal quotation marks, alterations, and citation omitted)).

### A. *Prima Facie* Case

As relevant here, race is a protected class under § 1981, Title VII, and NYSHRL, whereas gender is also a protected class under Title VII and NYSHRL. 42 U.S.C § 1981(a); 42 U.S.C. § 2000e-2(a)(2); N.Y. Exec. Law § 296[1](a). Here, Plaintiff, as an African-American male, belongs to the protected classes of race and gender, thus establishing the first element of his discriminatory discharge claims, which Defendant does not dispute. Nor does Defendant dispute that termination of Plaintiff's employment on March 13, 2015 following the ER Investigation was an adverse employment action. Nevertheless, Defendant disputes the remaining elements of a discriminatory discharge claim, *i.e.*, that Plaintiff was qualified for his OTP Advocate position as well as whether the adverse employment actions to which Plaintiff was subjected occurred under

circumstances giving rise to an inference of either race or gender-based discrimination. Defendant's Memorandum at 12-13.

Defendant argues Plaintiff cannot establish the second prong because Plaintiff failed to satisfactorily perform his job as evidenced by Plaintiff's violations of TWC policies insofar as Plaintiff made "numerous inappropriate, threatening, racist, and sexist statements to his coworkers and his supervisor," Defendant's Memorandum at 12, "purposefully avoided interacting with his Caucasian coworkers and 'blocked' coworkers from communicating with him through TWC's instant messaging systems to show he 'does not like them,'" *id.*, which conduct "offended, intimidated and scared his fellow OTP Advocates, as well as his supervisor, hindered their performance, and disrupted the workplace." *Id.* In employment discrimination actions alleging, as here, discriminatory discharge, whether an employee was "qualified" for the job from which he was discharged is analyzed "in terms of whether the plaintiff shows 'satisfactory job performance' at the time of the discharge," which "depends on the employer's criteria for the performance of the job – not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997) (citing cases). The Second Circuit further recognizes that an employee's "misconduct indicates a high likelihood that an employee's performance is not satisfactory," but that "[d]epending on the employer's standards, it is at least theoretically possible that an employee committed some misconduct and yet, in the aggregate, performed satisfactorily." *Thornley*, 104 F.3d at 29-30. Although Defendant urges the court to find that Plaintiff, by violating several of TWC's policies, "unquestionably failed to satisfactorily perform his job," Defendant's Memorandum at 12, Defendant has not provided any evidence

suggesting that Plaintiff's work otherwise fell below his employer's expectations.[11]  In light of the Second Circuit's admonition that "misconduct" does not necessarily establish unsatisfactory job performance, *Thornley*, 104 F.3d at 29-30, there exists a question of fact as to whether Plaintiff can establish the second element for a *prima facie* case of discriminatory discharge.

With there being no dispute that the termination of Plaintiff's employment constitutes an adverse employment action for purposes of the third element, the court turns to whether the record establishes at least a question of material fact that such adverse employment action occurred under circumstances giving rise to an inference of discrimination.  "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing cases).  Although whether two employees are similarly situated generally presents a question of fact for the jury, *Graham*, 230 F.3d at 39 (citing cases), "[t]his rule is not absolute, [ ] and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) (citing *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000)).  "In this analysis, there must be an 'objectively identifiable basis for comparability' between the plaintiff and the comparator employee, which includes an assessment of 'whether the conduct

---

[11] Rather, the record circumstantial suggests Plaintiff's work was not sub-par based on the fact that Plaintiff was a TWC employee for more than 14 years, during which Plaintiff was several times selected for jobs with more responsibilities, including the OTP Advocate position which Defendant's own job description indicates requires a proven history of communication skills and customer service experience. *See* Dkt. 43-5 at 59-61 (Bates TWC000406-08).

for which the employer imposed discipline was of comparable seriousness.'" *Zuk v.*
*Onondaga County*, 471 Fed.Appx. 70, 71 (2d Cir.  June 18, 2012) (quoting *Graham*,
230 F.3d at 40).

In the instant case, Plaintiff, who has not responded in opposition to summary
judgment, has provided no evidence to meet this burden regarding the comparability
element and, thus cannot establish the fourth element of a discriminatory discharge
claim under § 1981, Title VII, or NYSHRL.  Accordingly, even if a jury could find Plaintiff,
despite engaging in misconduct in violation of TWC's policies, satisfactorily performed
his job, because Plaintiff cannot establish his termination occurred under circumstances
giving rise to an inference of discrimination, *see Graham*, 230 F.3d at 39-40, Plaintiff
cannot establish a *prima facie* case of discriminatory discharge.  Nevertheless, because
this matter is before the undersigned for report and recommendation, should the District
Judge disagree and find at least the existence of a question of material fact as to
whether Plaintiff can establish a *prima facie* case of race or gender-based employment
discrimination, the considers whether Defendant has provided a legitimate, non-
discriminatory reason for its termination of Plaintiff's employment.

### B.  Legitimate, Non-Discriminatory Reasons

In satisfaction of Defendant's burden of establishing the termination of Plaintiff's
employment was for legitimate, non-discriminatory reasons, Defendant proffers more
than sufficient evidence establishing Plaintiff was terminated for violating TWC policies
against making inappropriate, threatening, racist and sexist statements to his co-
workers and supervisors.  In particular, upon receiving complaints from several of
Plaintiff's co-workers and his supervisor, Takach, about Plaintiff's conduct, TWC

undertook a thorough investigation that included interviewing at least eight TWC employees who corroborated the majority of the numerous asserted incidents of policy violations, including that Plaintiff referred to women as "stupid," and "belonged in the kitchen," asked a co-worker if she was engaging in self-harm by "cutting," referred to customers as "racist" based solely on their age and geographic location, made comments about the Ku Klux Klan, used his cell phone on TWC's call center floor in violation of TWC's cell phone policy, made negative comments about left-handed people, stated white people were required to work on the Martin Luther King, Jr. holiday, accused white customers of being "entitled," and commented about his gun ownership, including directing a statement to a co-worker whom Plaintiff advised should worry if he called her in the middle of the night. Facts, *supra*, at 6-10. Significantly, Plaintiff does not dispute any of Defendant's asserted reasons for terminating Plaintiff's employment.

Defendant thus has demonstrated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, thereby shifting the burden back to Plaintiff to establish such reason was mere pretext for unlawful race-based employment discrimination.

### C.    Pretext to Discrimination

Where the defendant articulates a legitimate, nondiscriminatory reason for its challenged actions, "the presumption of discrimination is rebutted and it 'simply drops out of the picture.'" *Connell v. Consolidated Edison Co. of New York, Inc.*, 109 F.Supp.2d 202, 207 (S.D.N.Y. 2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 510-11). Then the plaintiff must show, "without the benefit of any presumptions, that more likely than not the employer's decision was motivated at least in part by a discriminatory

reason." *Id.* (citing *Grady v. Affiliated Center, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). Plaintiff may do this by relying on the evidence already presented to establish a *prima facie* case of discrimination, as well as any additional evidence. *Id.* Further, "because the fourth prong of the prima facie case in this context is proof of circumstances giving rise to an inference of discrimination, as a practical matter, there is little difference between the evidence that a plaintiff would present in proving just the prima facie case and pretext in proving the 'ultimate fact of discrimination.'" *Id.* at 208 n. 5.

In the instant case, Plaintiff has completely failed to argue or to provide any evidence challenging Defendant's legitimate and non-discriminatory reasons for terminating his employment in opposition to summary judgment. Accordingly, even when viewed in the light most favorable to Plaintiff, the record fails to establish the existence of any issue of fact requiring trial as to whether Defendant's proffered explanation is mere pretext for race or gender-based discrimination. Summary judgment therefore should be GRANTED in favor of Defendant on Plaintiff's discriminatory discharge claims.

**3.    Title VII – Retaliation**

Plaintiff's retaliation claims are asserted under 42 U.S.C. § 1981, Complaint ¶¶ 30-36 ("Second Claim"), Title VII, Complaint ¶¶ 43-50 ("Fifth Claim"), and NYSHRL, Complaint ¶¶ 51-58 ("Sixth Claim"), and are analyzed pursuant to the same *McDonnell Douglas* burden-shifting test applied to Plaintiff's discriminatory discharge claims with Plaintiff required to establish a *prima facie* case of retaliatory discharge, shifting the burden to Defendant to show a legitimate, nonretaliatory reason for the discharge, with the burden then returning to Plaintiff to establish such asserted reason is mere pretext

for impermissible retaliation. *Blanc v. Sagem Morpo, Inc.*, 394 Fed.Appx. 808, 809 (2d Cir. Oct. 1, 2010) (considering retaliation claims alleged under § 1981, Title VII, and NYSHRL under *McDonnell Douglas* burden-shifting test).  Regarding Plaintiff's initial burden, to establish a *prima facie* case of retaliation, "a plaintiff is required to show by a preponderance of the evidence that: (1) the plaintiff participated in a protected activity; (2) the defendant knew of the protected activity; (3) the plaintiff experienced an adverse employment action, . . . and (4) a causal connection exists between the protected activity and the adverse employment action." *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003)).  Plaintiff's burden at the *prima facie* step is "*de minimis*," and "'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  Should Plaintiff meet his burden of establishing a *prima facie* case of retaliation, "a presumption of retaliation arises," shifting the burden to the defendants to "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173. Once Defendants have asserted a neutral reason for the alleged discriminatory action, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.*   In the instant case, Defendant argues, Defendant's Memorandum at 15-20, and the record establishes, that Plaintiff cannot establish a *prima facie* case of retaliation because there is no evidence of Plaintiff engaged in any protected activity and even if Plaintiff did engage in some

protected activity, the occurrence of which Defendant disputes, the record establishes that Plaintiff's violation of TWC policies was the sole reason for Plaintiff's discharge.

With respect to the first element of a *prima facie* retaliation claim, activity that is protected against retaliation includes not only formal complaints filed with an agency such as the EEOC, or commencing a lawsuit, but also internal complaints made to management, *Raniola v. Bratton*, 243 F.3d 610, 624-25 (2d Cir. 2001) (citing cases), and the plaintiff need not prove that her underlying complaint of discrimination had merit." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (citing cases). Defendant maintains Plaintiff's filing of the two internal complaints raising concerns that TWC was engaging in discriminatory conduct by disproportionately terminating the service of minority customers, and that Plaintiff was sometimes subjected to racially-harassing language directed to him by TWC customers do not satisfy the "protected activity" prong of a *prima facie* case of retaliation.  Defendant's Memorandum at 16-20. Insofar as Plaintiff made complaints that TWC terminated services for a disproportionate number of minority customers, and that he was routinely subjected to racially-harassing comments from some customers, such activity is not protected because it does not concern a prohibited employment practice.  *See Wimmer v. Suffolk County Police Dept.*, 176 F.3d 125, 135-36 (2d Cir. 1999) (considering plaintiff's complaint that certain co-workers acted in a discriminatory manner toward the public insufficient to establish the first element of *prima facie* retaliation claim which required Plaintiff's complaint be "directed at an unlawful *employment practice* of his employer."  (italics in original and citing cases)).  Accordingly, neither of Plaintiff's complaints constitutes protected activity for the purposes of the first element of a retaliation claim.

Even assuming Plaintiff's complaints could be found by a jury to qualify as protected activity, it is not disputed that Defendant knew of such activity as required for the second retaliation claim element, or that Plaintiff's termination of his employment was an adverse employment action.  Furthermore, to establish causation in the context of retaliation, the Plaintiff must show "the retaliation was a 'but-for' cause of the employer's adverse action . . . .  'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive.'"  *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 90, 90-91 (2d Cir. 2015)).  "Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity."  *Id.*  In the instant case, that Krentz referred complaints of Plaintiff's conduct for investigation by TWC's Human Resources department on January 26, 2015, less than one week after Plaintiff's second complaint, is circumstantial evidence of a causal connection between Plaintiff's making the complaint and the termination of Plaintiff's employment.  *See Feingold v. New York*, 366 F.3d 138, 156-57 (2d Cir. 2004) (fact that the plaintiff's employment was terminated within two weeks of Plaintiff complaining to supervisor sufficient to indirectly establish causal connection for retaliation claim).   The record thus contains circumstantial evidence on which a jury could find the investigation of Plaintiff, which lead to Plaintiff's discharge, was causally related to the complaint Plaintiff made to Krentz in January 2015 regarding racially harassing customers.

Because the record, considered in the light most favorable to Plaintiff, establishes the remaining three elements of a *prima facie* retaliation claims, and as the

matter is before the undersigned for report and recommendation, then should the District Judge disagree with the initial determination that the record does not support the first element for retaliation, *i.e.*, that Plaintiff's complaints related to protected employment activities, the undersigned considers whether Defendant has provided a legitimate, non-discriminatory reason for its termination of Plaintiff's employment. Nevertheless, just as Defendant has provided in connection with Plaintiff's discriminatory discharge claims undisputed evidence of legitimate, nondiscriminatory reasons for terminating Plaintiff's employment, *see* Discussion, *supra*, at 17-18, which reasons Plaintiff has failed to demonstrate may be mere pretext for discrimination, *id.* at 18-19, such failure also establishes Plaintiff cannot show the legitimate, nondiscriminatory reasons are mere pretext to retaliation as Plaintiff alleges.

Accordingly, Defendant's motion for summary judgment should be GRANTED as to Plaintiff's retaliation claims.

## CONCLUSION

Based on the foregoing, Defendant's Motion (Dkt. 43), should be GRANTED; the Clerk of Court should be directed to close the file.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      July 9, 2019
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    July 9, 2019
             Buffalo, New York